FILED

Feb 14 2018, 5:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEYS FOR APPELLANTS | ATTORNEYS FOR APPELLEES |
|---|---|
| Kim E. Ferraro | Andrew M. McNeil |
| Samuel J. Henderson | Daniel P. McInerny |
| Hoosier Environmental Council | Mark A. Wohlford |
| Valparaiso, Indiana | Bose McKinney & Evans, LLP |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

<table>
<tr><td>

Martin Richard Himsel, Janet Himsel, Robert Lannon, and Susan Lannon,

*Appellants-Plaintiffs,*

v.

Indiana Pork Producers Association and Livestock Engineering Solutions,

*Appellees-Nonparties.*

</td><td>

February 14, 2018

Court of Appeals Case No. 32A01-1703-PL-612

Appeal from the Hendricks Superior Court

The Honorable Mark A. Smith, Judge

Trial Court Cause No. 32D04-1510-PL-150

</td></tr>
</table>

**Barnes, Judge.**

# Case Summary

In this interlocutory appeal, Martin and Janet Himsel and Robert and Susan Lannon (collectively "the Plaintiffs") appeal the trial court's award of $4,980.50 in attorney fees to Indiana Pork Producers Association, Inc. ("IPPA") and $3,925.04 in attorney fees and other expenses to Livestock Engineering Solutions, Inc. ("LES"), arising from a discovery dispute between the Plaintiffs, IPPA, and LES. IPPA and LES cross-appeal, contending they were entitled to more attorney fees. We affirm.

# Issues

The restated issues before us are:

I.      whether the trial court properly denied the Plaintiffs' motion to compel the production of documentary evidence from IPPA and LES, who were nonparties in the Plaintiffs' litigation against different defendants; and

II.      whether the amount of attorney fees and expenses awarded to IPPA and LES was reasonable. This includes both the Plaintiffs' contention that the trial court awarded too much and IPPA and LES's contention that it awarded too little.

# Facts

In 2013, Samuel, Cory, and Clinton Himsel ("the Himsels") obtained a rezoning of their property from the Hendricks County Plan Commission to allow for construction of a concentrated animal feeding operation ("CAFO"). The Plaintiffs, who live near the property, objected to the rezoning. During a

hearing regarding the rezoning, Josh Trenary from IPPA testified in favor of the rezoning, stating in part that no studies had been done regarding odors from hog CAFOs and denying that there was any correlation between CAFOs and a loss of value to nearby properties. IPPA essentially is a lobbying and informational entity for the pork industry in Indiana. The Indiana Department of Environmental Management ("IDEM") subsequently issued a permit to allow construction of a CAFO on the rezoned property.

[4]    The Himsels created an LLC, 4/9 Livestock, to own and operate the CAFO. 4/9 Livestock entered into a contract with Co-Alliance, LLP, which would own the hogs at the CAFO. LES is an agricultural engineering firm that provided consultation regarding construction of the CAFO and approval of the facility from IDEM. The CAFO was completed in September 2013 and eventually housed up to 8,000 hogs.

[5]    On October 6, 2015, the Plaintiffs, represented by the Hoosier Environmental Council, filed suit against the Himsels, 4/9 Livestock, and Co-Alliance; IPPA and LES were not named as defendants. The complaint alleged that the Plaintiffs' use and enjoyment of their homes, as well as their homes' value, were ruined by noxious odors and airborne emissions coming from the CAFO. Furthermore, the complaint alleged that, contrary to Trenary's testimony at the rezoning hearing, there are numerous studies indicating that hog CAFOs generate extreme odors and noxious emissions and that the property values for persons living nearby are significantly reduced thereby. The complaint sought recovery under theories of nuisance, negligence, and trespass, and also sought a

declaratory judgment that Indiana's "right to farm" laws that favor agricultural operations are unconstitutional.

[6] On March 28, 2016, the Plaintiffs sent a request for production of documents and subpoena to IPPA under Indiana Trial Rules 34(C) and 45. The subpoena noted, as required by the Trial Rules, that IPPA was "entitled to security against damages or payment of damages resulting from this request." Appellant's App. Vol. II p. 64. The subpoena had eighteen requests, some of which were divided into multiple subparts, as follows:

> 1. Any and all documents regarding the Defendants' CAFO, the named Defendants in this action, and/or this lawsuit.

> 2. Any and all communications between the IPPA and any of the named Defendants in this action, and/or anyone acting on the Defendants' behalf, including but not limited to correspondence, emails, letters, notes taken during telephonic conversations, and any other record of communication as that term is defined above.

> 3. Any and all IPPA intra-office communications, including but not limited to emails, letters, memoranda, notes taken during telephonic conversations, proposed responses, and reviews regarding any of the named Defendants in this action, the Defendants' CAFO and/or this lawsuit.

> 4. All correspondence, documents, or written communications from, to, or between you, or on your behalf, and the U.S. EPA ("EPA"), the Indiana Department of Environmental Management ("IDEM"), the Indiana State Department of Agriculture ("ISDA"), Hendricks County officials, or any other governmental entity, local, county, state or

federal (as well as any of these entities' agents, servants, representatives or employees) relating to the Defendants' CAFO including but not limited to communications relating to any aspect of the Defendants obtaining government approvals and/or permits; monitoring and/or reporting of odors, air emissions or emissions estimates from the Defendants' CAFO; or any aspect of siting, constructing, owning, operating, maintaining or managing the Defendants' CAFO.

5.    All correspondence, documents, statements or communications from, to, or between you, or on your behalf, and any public or private institutions, research center, other professional, trade or advocacy organization, farm association, cooperative, union or other similar entities (as well as any of these entities' agents, servants, representatives or employees) relating to any aspect of the Defendants obtaining government approvals and/or permits; monitoring and/or reporting of odors, air emissions or emissions estimates from the Defendants' CAFO; or any aspect of siting, constructing, owning, operating, maintaining or managing the Defendants' CAFO.

6.    Any and all documents pertaining to permits, variances, special exceptions, rezoning or other such approvals of any kind to construct, operate or use land on which the Defendants' CAFO is located or other land owned or controlled by any of the named Defendants to this action.

7.    Any and all documents regarding the ownership, management and/or control of the Defendants' CAFO including but not limited to production contracts, grower service contracts, real estate transfer documents, purchase agreements, lease agreements, partnership agreements, employment contracts, or operator agreements.

8.    Any and all photographs or videos pertaining to the Defendants' CAFO.

9.    Joshua Trenary's entire file regarding the Defendants' CAFO, his testimony on the Defendants' behalf before the Hendricks County Area Plan Commission on March 12, 2013, and all other documents related to and/or demonstrating the nature of the relationship and involvement of the IPPA and/or Joshua Trenary with the Defendants.

10.    Please produce a copy of the "study done by Indiana University using actual sales data to study the relationship between property values and livestock operations" as referred to by Joshua Trenary in his testimony before the Hendricks County Area Plan Commission on March 12, 2013 at the public hearing on the Defendants' rezoning request.

11.    Please produce a copy of the "cost of community services study funded by the Indiana Soybean Association" as referred to by Joshua Trenary in his testimony before the Hendricks County Area Plan Commission on March 12, 2013 at the public hearing on the Defendants' rezoning request.

12.    Referring to the Minutes of the March 12, 2013 public hearing on Defendants' rezoning request before the Hendricks County Area Plan Commission, please produce all documents that support or are related to the following statements made by Joshua Trenary:

>    a.    "If an operator want[s] to avail himself of the type of state of the art environmental safeguards available in a modern livestock facility, it would be necessary to build one of the size and scope that could maintain that advanced of a facility and still be profitable."

b.      "Residents in Hendricks County would be benefitting from the proposed [Defendants' CAFO]."

c.      "[The Defendants are] a farm family building a facility that they would own.  Both sides of the transaction would be benefitting or they would not be entering into the transaction.  The family farm is still taking on all of the financial risk of the facility and the environmental liability."

d.      "There are no air regulations on a CFO because there is no consensus in the nation on what emissions levels are harmful and what levels should be regulated.  There is not enough data to regulate air emissions on livestock operations."

13.    Any and all test results, findings, reports, records, spreadsheets, photos, videos or documents of any kind relating to testing, monitoring, estimates and/or analysis of odors, odorous compounds and/or air emissions, including but not limited to airborne emissions of ammonia, hydrogen sulfide, and/or particulate matter, from any CAFO, CFO or other livestock facility in Indiana that IPPA has made available to:  1) the public; 2) members and/or supporters of IPPA; 3) the regulated community and/or interested stakeholders through educational seminars, conferences and the like; and/or 4) directly to one or more of the Defendants within the last ten (10) years.

14.    Any and all documents in your possession or control related to the National Air Emissions Monitoring Study (NAEMS) conducted by Purdue University and the U.S. EPA including but not limited to testing data, reports of findings, photos, videos, publications, fact sheets, bulletins, inter-office memos, notes, summaries, emails, communications, documents demonstrating input and/or involvement by participating

livestock operations, citizens, government agencies, academic institutions and/or the IPPA such as comments, correspondence, emails, memos or any other related documents.

15.     All IPPA publications, policy papers, fact sheets, bulletins, newsletters, worksheets or other written information whether prepared by IPPA or on the Association's behalf, about controlling, monitoring, reporting, calculating estimates, emissions factors, or other analyses of airborne emissions from CAFOs or CFOs for purposes of any federal, state or local law, rule, regulation or standard that IPPA has made available to:  1) the public; 2) members and/or supporters of IPPA; 3) the regulated community and/or interested stakeholders through educational seminars, conferences and the like; and/or 4) directly to one or more of the Defendants within the last ten (10) years.

16.     All documents relating to citizen complaints and/or inquiries, whether formal or informal, made to or received by the IPPA about odors, odorous compounds and/or air emissions from CAFOs, CFOs or other livestock operations in Indiana within the last ten (10) years.

17.     All correspondence, documents, statements, memos, policy papers, briefs or communications from, to, or between you, or on your behalf, and any public or private institution, government agency, research center, professional, trade or advocacy organization, farming association, cooperative, union or other similar entities (as well as any of these entities' agents, servants, representatives or employees) within the last ten (10) years related to the following:

a.     odors, odorous compounds and/or air pollution from CAFOs or CFOs;

b.      regulation of odors, odorous compounds and/or air pollution from CAFOs or CFOs;

c.      community impacts of CAFOs or CFOs including but not limited to reduced air quality or reduction in property values;

d.      the application, interpretation or requirements of Ind. Code § 32-30-6-9;

e.      the application, interpretation or requirements of Ind. Code § 15-11-2(a).

18.     Produce all studies, articles, reports, policy papers, assessments, fact sheets, or other documents in your possession or control related to the following:

a.      odors, odorous compounds and/or air pollution from CAFOs and CFOs;

b.      regulation of odors, odorous compounds and/or air pollution from CAFOs and CFOs;

c.      community impacts of CAFOs or CFOs including but not limited to reduce air quality or reduction in property values;

d.      the application, interpretation or requirements of Indiana's Right to Farm Act at Ind. Code § 32-30-6-9;

e.      the application, interpretation or requirements of Ind. Code § 15-11-2(a).

*Id.* at 68-71.

[7] In response to this subpoena, IPPA produced some documents to request number one but limited those documents to those it deemed nonprivileged and only those from the time period when IPPA was assisting the Defendants in obtaining permission to rezone their land and operate a CAFO thereon, or beginning in March 2013. IPPA also agreed, in response to requests number ten and eleven, to produce specific reports Trenary had referred to in his testimony before the Hendricks County Area Plan Commission. IPPA objected to responding to any of the other subpoena requests. Generally, IPPA claimed the requests were overbroad, privileged, requested documents not in its possession, and/or would be overly burdensome for IPPA to comply with. IPPA also requested "appropriate security against damages it proximately incurs in responding to this subpoena and reasonably resisting its overbroad provisions." *Id.* at 75. However, it did not specify an amount of security.

[8] Counsel for the Plaintiffs and IPPA engaged in phone, letter, and email communications in an attempt to resolve their dispute without court intervention. In response to the Plaintiffs' request that IPPA specify the amount of "security" it was seeking for complying with the subpoena, IPPA wrote in a May 16, 2016 email that it had already incurred approximately $5,000 in attorney fees and expenses in reviewing and responding to the subpoena and that it expected that amount to increase. The Plaintiffs did not pay anything to IPPA at this time.

[9]     On August 10, 2016, the Plaintiffs served a second subpoena duces tecum upon IPPA. This subpoena generally sought documents and communications in IPPA's possession or control related to an "Air Quality Agreement with Animal Feeding Operations" prepared by the EPA; a 1997-2000 "On-Farm Odor Management Assistance Program" prepared by the National Pork Board ("NPB") and the National Pork Producers Council ("NPPC"); and a 1997-98 "Odor Solutions Initiative" prepared by the NPB and NPPC. The subpoena also sought information regarding the employment of two individuals with IPPA. IPPA objected to all the requests in the second subpoena, generally on the grounds of overbreadth and their irrelevancy to the parties and subject matter of the litigation between the Plaintiffs and the Defendants. IPPA also noted that the Plaintiffs had never paid anything toward its attorney fees in relation to the first subpoena.

[10]    Also on August 10, 2016, the Plaintiffs served a subpoena duces tecum upon LES. The Plaintiffs sought all communications between LES and the Defendants regarding the construction and operation of the CAFO at issue. They also sought "[a]ll correspondence, letters, emails, reports, memoranda, invoices, telephone records, or any other documents in your possession regarding the at-issue CAFO." *Id.* at 160. Furthermore, they wanted to obtain documents related to the EPA, NPB, and NPPC reports referred to in the subpoena to IPPA. Finally, the subpoena requested records from LES regarding the determination of where the CAFO would be located. LES agreed to provide documents it had produced regarding the CAFO, but asserted there

were no documents exchanged between it and the Defendants regarding the CAFO because it had worked with a third party, not any of the Defendants. LES also asserted that it played no role in determining the location of the CAFO and so had no documents on that issue. It also asserted it would be unduly burdensome to obtain all phone records regarding the CAFO, and that the requests regarding the EPA, NPB, and NPPC reports were overly broad and unrelated to the parties and subject matter of the litigation.

[11]   On October 5, 2016, both IPPA and LES filed formal petitions with the trial court requesting the Plaintiffs to pay attorney fees related to their response to the subpoenas.[1] IPPA sought $4,980.50 in attorney fees for evaluating and partially complying with the subpoenas, $3,480.00 for reasonably resisting the subpoenas, and $5,923.00 for attempting to recover attorney fees for reasonably resisting the subpoenas. LES sought $2,572.75 in attorney fees for evaluating and partially complying with the subpoena, and $5,033.00 for reasonably resisting the subpoena and for attempting to recover attorney fees for reasonably resisting; LES also sought $1,353.29 in costs for its non-attorney principal's time spent responding to the subpoena.

[12]   The Plaintiffs filed cross-motions to compel IPPA and LES to fully comply with the subpoenas, requesting that the trial court deny IPPA and LES's attorney fees petitions, and seeking attorney fees of their own. After conducting a

---

[1] IPPA and LES were and are represented by the same attorneys.

hearing on the matter on February 1, 2017, the trial court entered an order denying the Plaintiffs' motion to compel, expressly finding "that the non-parties reasonably resisted the Plaintiffs' efforts to seek irrelevant, overbroad and onerous discovery." *Id.* at 27. However, the trial court did not award IPPA and LES the full amount of attorney fees they were seeking. It awarded IPPA $4,980.50 and LES $2,572.75 "for time spent evaluating and responding to the subpoenas"; it also awarded LES $1,352.29 "for direct expenses incurred responding to the subpoenas . . . ." *Id.* at 26. The trial court explained its refusal to award more attorney fees to IPPA and LES by stating, "Just as the non-parties reasonably resisted, the Plaintiffs sought relief they believed themselves to be entitled by filing a motion to compel. The Court finds that an award of additional fees would be unjust under these circumstances." *Id.* at 27. The Plaintiffs now appeal and the Defendants cross-appeal.[2]

## Analysis

[13] The Plaintiffs are appealing an interlocutory order. It is appealable as of right because the trial court's order compelled them to pay money to IPPA and LES. *See* Ind. Appellate Rule 14(A)(1). Moreover, in the interest of judicial economy, we will review the intertwined discovery order in this case, the denial

---

[2] On December 16, 2016, the Defendants moved for summary judgment. On October 24, 2017, the trial court granted summary judgment in favor of the individual defendants but denied it as to the corporate defendants, 4/9 Livestock and Co-Alliance. The trial court reserved judgment on the constitutionality of the "right to farm" statutes. 4/9 Livestock and Co-Alliance have filed a motion to correct error in response to that ruling, which has not yet been resolved.

of the Plaintiffs' motion to compel. *See White-Rodgers v. Kindle*, 925 N.E.2d 406, 411 (Ind. Ct. App. 2010).

## I. Denial of Motion to Compel

A trial court has broad discretion in ruling upon discovery matters, and we will reverse such rulings only when there has been a clear abuse of discretion. *Davidson v. Perron*, 756 N.E.2d 1007, 1012 (Ind. Ct. App. 2001), *trans. denied*. An abuse of discretion occurs if a decision is clearly against the logic and effect of the facts and circumstances before the court, or if the trial court has misinterpreted the law. *Wright v. Miller*, 989 N.E.2d 324, 330 (Ind. 2013). There is a presumption that a trial court will act fairly and equitably in each case before it. *Id.* Also, "[b]ecause of the fact-sensitive nature of discovery issues, a trial court's ruling is cloaked with a strong presumption of correctness." *Davidson*, 756 N.E.2d at 1012. We also note that the trial court made some written statements accompanying its order that might be construed as sua sponte findings. We will affirm a general judgment with sua sponte findings if it can be sustained on an legal theory supported by the record. *Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 333 (Ind. Ct. App. 2011).

Indiana Trial Rule 34(C) permits a party to request the production of documents from a nonparty in conjunction with the issuance of a subpoena under Trial Rule 45. If a nonparty objects to the subpoena, the requesting party may file a motion to compel discovery under Trial Rule 37(A). Additionally, Trial Rule 26(C) "requires that any party or third party from whom discovery is requested may be protected from 'annoyance, embarrassment, oppression, or

undue burden or expense' and permits a variety of conditions to be imposed."
*In re WTHR-TV*, 693 N.E.2d 1, 6 (Ind. 1998). Under the Indiana Trial Rules,
discovery generally should go forward, "but, if challenged, a balance must be
struck between the need for the information and the burden of supplying it." *Id.*
"[W]here non-parties to a dispute are involuntarily dragged into court their
interest in being left alone is a legitimate consideration in this balancing and
they are no less entitled to any protections the Trial Rules afford." *Id.*

[16] We also set forth the general parameters of permissible discovery found in Trial
Rule 26(B):

> Parties may obtain discovery regarding any matter, not
> privileged, which is relevant to the subject-matter involved in the
> pending action, whether it relates to the claim or defense of the
> party seeking discovery or the claim or defense of any other
> party, including the existence, description, nature, custody,
> condition and location of any books, documents, or other
> tangible things and the identity and location of persons having
> knowledge of any discoverable matter. It is not ground for
> objection that the information sought will be inadmissible at the
> trial if the information sought appears reasonably calculated to
> lead to the discovery of admissible evidence.
>
> The frequency or extent of use of the discovery methods
> otherwise permitted under these rules and by any local rule shall
> be limited by the court if it determines that: (i) the discovery
> sought is unreasonably cumulative or duplicative, or is obtainable
> from some other source that is more convenient, less
> burdensome, or less expensive; (ii) the party seeking discovery
> has had ample opportunity by discovery in the action to obtain
> the information sought or; (iii) the burden or expense of the
> proposed discovery outweighs its likely benefit, taking into

account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. The court may act upon its own initiative after reasonable notice or pursuant to a motion under Rule 26(C).

[17] IPPA and LES did provide some response to the Plaintiffs' subpoenas. Specifically, they agreed to provide documents directly related to construction of the Defendants' CAFO. IPPA also agreed to produce written reports that Trenary specifically mentioned during his testimony before the Hendricks County Plan Commission. Also, IPPA and LES responded to several of the document requests stating that they did not have the documents the Plaintiffs were requesting. For example, LES stated that it had no documents related to the siting of the CAFO because it was not involved in that decision, nor that it had direct communications with any of the Defendants. The Plaintiffs continue to insist on appeal that LES must have some of these documents, but we see no basis in the record to question LES's representation that it did not have them.

[18] The Plaintiffs generally contend that they were entitled to seek additional discovery from IPPA and LES to support their negligence claim, i.e. to prove that the Defendants knew or should have known that locating their CAFO so close to the Plaintiffs' residences would negatively impact their homes because of odors and noxious emissions. The elements of a negligence action are: (1) a duty owed to plaintiff by defendant; (2) breach of that duty by conduct falling below the applicable standard of care; and (3) compensable injury proximately caused by the breach of duty. *Williams v. Cingular Wireless*, 809 N.E.2d 473, 476

(Ind. Ct. App. 2004), *trans. denied*. Foreseeability of harm is a component of both duty and proximate cause. *Id.* at 477. When determining whether a particular act is the proximate cause of an injury, the issue is whether the injury was a natural and probable consequence of the act that should have been foreseen or anticipated in light of the circumstances. *Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002).

[19] We will assume for the sake of argument that much of the material the Plaintiffs were seeking from IPPA and LES was relevant to the question of foreseeability in a negligence case.[3] That is, communications by IPPA and/or LES to the Defendants regarding foul odors and noxious emissions from CAFOs, or more general information on that topic, could be relevant to what the Defendants knew or should have known when they built their CAFO in close proximity to the Plaintiffs' homes. However, relevance is not the end of the analysis when it comes to compelling discovery, especially where a nonparty is concerned. There are multiple considerations to be balanced, as reflected in Trial Rule 26(B). When weighing those considerations, as well as IPPA's and LES's interests in being left alone as strangers to this litigation, we cannot say the trial court abused its discretion in denying the Plaintiffs' motion to compel.

[20] The Plaintiffs' subpoenas requested a wide breadth of documents from IPPA and LES, some of them going back two decades. Many of the requested

---

[3] There is no claim by IPPA and LES on appeal that the Plaintiffs were seeking privileged or confidential information.

documents had no direct relation to the Defendants' CAFO or to the Defendants at all, for that matter. Some of the documents it would appear could be more readily obtained from other sources, such as information related to the reports prepared by the EPA, NPB, and NPPC regarding CAFOs.

[21] Most importantly, it appears from the record that the Plaintiffs already acquired substantial evidence from other sources regarding the readily-available knowledge of the potentially-harmful effects of CAFOs as reflected in government, academic, and scientific studies. The Plaintiffs had evidence that Samuel Himsel and the CEO of Co-Alliance in particular were aware of such potential harmful effects before the CAFO at issue was constructed. The Plaintiffs relied upon such evidence and designated it in their response to the Defendants' December 16, 2016 summary judgment motion. That evidence was enough to convince the trial court to deny the corporate Defendants' summary judgment motion; the court stated in its order denying summary judgment that there were genuine issues of material fact as to whether the CAFO was a nuisance, whether the CAFO was negligently sited and operated, and whether the intrusion of noxious odors onto the Plaintiffs' properties from the CAFO constituted trespass.[4]

[22] Considering the evidence the Plaintiffs were able to compile without obtaining all the information they sought from IPPA and LES, it is unclear how much

[4] The trial court granted summary judgment to the individual Defendants on the basis of the corporate shield from liability.

they truly need that information, particularly in light of the sheer breadth of records the subpoenas asked IPPA and LES to comb over. In other words, the discovery that the Plaintiffs were seeking from IPPA and LES could be considered "unreasonably cumulative or duplicative, or . . . obtainable from some other source that is more convenient, less burdensome, or less expensive . . . ." *See* Ind. T.R. 26(B)(1)(i). Alternatively, it is possible that, "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *See* Ind. T.R. 26(B)(1)(iii). That is to say, the burden on nonparties IPPA and LES in complying with the subpoenas would be substantial with little additional benefit to the Plaintiffs in proving their claims, in light of the evidence the Plaintiffs have already discovered. Keeping in mind the broad discretion that trial courts enjoy in ruling on discovery disputes, which requires carefully balancing the circumstances and equities of each case, we cannot say the trial court here abused its discretion in denying the Plaintiffs' motion to compel IPPA and LES to more completely comply with the subpoenas.[5]

---

[5] This holding necessarily resolves the Plaintiffs' argument that they should have been awarded attorney fees in addition to the granting of the motion to compel.

## II. *Reasonableness of Attorney Fees Awarded*

Next, we address the Plaintiffs' argument that IPPA and LES asked for and the trial court awarded an excessive amount in attorney fees for reviewing and partially complying with the subpoenas. Additionally, we believe that we should consider IPPA and LES's cross-appeal, claiming that they were awarded too little in fees, in conjunction with this issue. That is to say, the total amount of attorney fees and other costs awarded to IPPA and LES should be viewed as a whole, in light of all the facts and circumstances of the case.

We review the amount and reasonableness of an attorney fee award for an abuse of discretion. *Cavallo v. Allied Physicians of Michiana, LLC*, 42 N.E.3d 995, 1009 (Ind. Ct. App. 2015). Where the amount of a fee award is not inconsequential, there must be objective evidence of the nature of the legal services and the reasonableness of the fee. *Id.*

An award of attorney fees to a nonparty in connection with a subpoena is governed by Indiana Trial Rules 34(C)(3) and 37(A)(4). Rule 34(C)(3) provides:

> The [subpoena] shall contain the matter provided in subsection (B) of this rule. It shall also state that the witness or person to whom it is directed is entitled to security against damages or payment of damages resulting from such request and may respond to such request by submitting to its terms, by proposing different terms, by objecting specifically or generally to the request by serving a written response to the party making the request within thirty (30) days, or by moving to quash as permitted by Rule 45(B). Any party, or any witness or person

upon whom the request properly is made may respond to the request as provided in subsection (B) of this rule. If the response of the witness or person to whom [a subpoena] is directed is unfavorable, if he moves to quash, if he refuses to cooperate after responding or fails to respond, or if he objects, the party making the request may move for an order under Rule 37(A) with respect to any such response or objection. In granting an order under this subsection and Rule 37(A)(2) the court shall condition relief upon the prepayment of damages to be proximately incurred by the witness or person to whom the request is directed or require an adequate surety bond or other indemnity conditioned against such damages. Such damages shall include reasonable attorneys' fees incurred in reasonable resistance and in establishing such threatened damage or damages.

[26]     Rule 37(A)(4) in turn states:

If the motion [to compel] is granted, the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

If the motion is denied, the court shall, after opportunity for hearing, require the moving party or the attorney advising the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

> If the motion is granted in part and denied in part, the court may apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner.

[27] We examined these two provisions in *Gonzalez v. Evans*, 15 N.E.3d 628 (Ind. Ct. App. 2014), *trans. denied*. We held in part, "[n]on-parties subjected to subpoenas . . . may reasonably be expected to consult with counsel to ensure compliance with the subpoena without unnecessarily divulging privileged information *or to determine whether there is any legal basis to object to the subpoena*." *Gonzalez*, 15 N.E.3d at 637 (emphasis added). We further explained that under Trial Rule 34(C)(3), a subpoenaed nonparty is entitled to "'damages . . . proximately incurred by the witness or person'" and that such damages "may include attorney fees directly related to complying with a subpoena, regardless of whether there was a basis for resisting it." *Id.* (citing *Int'l Bus. Mach. Corp. v. ACS Human Servs.*, LLC, 999 N.E.2d 880, 885 (Ind. Ct. App. 2012), *trans. denied*).

[28] Here, IPPA submitted documentation regarding the time its lawyers and other legal professionals spent in relation to the subpoenas. That documentation was split into three categories: "fees associated with evaluating the subpoenas and complying with discovery"; "fees from reasonable resistance to the subpoenas"; and "fees from having to seek recovery for reasonable resistance fees". Appellants' App. Vol. II pp. 93, 95, 97. The time spent on the first category was 12.5 hours for a total cost of $4,980.50. The time spent on the second category was 8.4 hours for a total cost of $3,480.00. The time spent on the third

category was 22.8 hours for a total cost of $5,923.00. The billing rates for the attorneys representing IPPA, from the large Indianapolis firm of Bose McKinney & Evans, were $450, $410, and $225 per hour; a paralegal also worked on the case at a rate of $185 per hour. The trial court only awarded IPPA its attorney fees related to the first category.

[29] As for LES, which utilized the same attorneys and paralegal as IPPA at the same hourly rates, it asserted time spent "evaluating the subpoenas [sic] and complying with discovery" as 7.4 hours at a total cost of $2,572.75. *Id.* at 167. As for "reasonable resistance to the subpoenas [sic] and seeking to recover for reasonable resistance," it asserted time spent of 17.15 hours at a total cost of $5,033.00. *Id.* at 168. Again, the trial court only awarded attorney fees in relation to the first category.[6]

[30] The gist of the Plaintiffs' argument is that IPPA and LES did not need to hire such expensive attorneys to evaluate and respond to the subpoenas, which they characterize as routine and not seeking any confidential or privileged information. When evaluating the reasonableness of an attorney fee award, the starting point is the hours worked and the hourly rate charged. *Cavallo*, 42 N.E.3d at 1009. The trial court may consider a number of other factors,

---

[6] The trial court also awarded $1,353.29 to LES in costs for the time its principal—an engineer—spent responding to the subpoena. The Plaintiffs fail to differentiate this amount in its argument regarding attorney fees. We conclude they have waived any objection on appeal to this amount for failing to make a cogent argument as to why it was improper or excessive. *See Brazier v. Maple Lane Apartments I, LLC*, 45 N.E.3d 442, 451 (Ind. Ct. App. 2015) (citing Ind. Appellate Rule 46(A)(8)), *trans. denied*.

including the responsibility of the parties in incurring the attorney fees and the judge's personal expertise and knowledge. *Id.* In addition, a court may consider the factors listed in Indiana Professional Conduct Rule 1.5(a) governing the reasonableness of a fee for disciplinary purposes, but it is not required to expressly do so.[7] *Id.* at 1009-10.

[31] We first reject the Plaintiffs' suggestion that under Trial Rule 34(C)(3) and *Gonzalez*, a nonparty is only entitled to attorney fees with respect to evaluating whether a subpoena is seeking confidential or otherwise sensitive information. Although that was indeed the type of information sought in *Gonzalez*, as well as in the *IBM* case upon which *Gonzalez* relied, we also stated that attorney consultation by a nonparty was permissible "to determine whether there is *any* legal basis to object to the subpoena." *Gonzalez*, 15 N.E.3d at 637 (emphasis added). As discussed in Part I of this opinion, overbreadth and undue burden upon a nonparty are two such legal bases for objecting to a subpoena. IPPA

---

[7] Those factors are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

and LES were entitled to have their attorneys review the broad subpoenas they received before expending substantial time and effort attempting to comply with them. They also were entitled under Trial Rule 34(C)(3) to recover attorney fees from the Plaintiffs related to that review and their partial compliance with the subpoenas.

[32] We also cannot say that counsel for IPPA and LES spent an inordinate or unreasonable amount of time evaluating the subpoenas and facilitating partial compliance with them. Again, about 12.5 hours was spent with respect to the two subpoenas sent to IPPA and 7.4 hours on the one subpoena sent to LES. In other words, approximately three work days were spent on three lengthy and detailed subpoenas. This amounts to roughly one day of work on each of them, which does not seem outlandish.

[33] The hourly rate charged here is undoubtedly at the high end of the scale. IPPA and LES chose to employ some of the most highly-paid attorneys at one of the largest firms in Indiana to review the subpoenas. Combining the hourly rates of all the attorneys and the paralegal who worked on the subpoenas, IPPA was charged $398.44 per hour with respect to its subpoenas and LES was charged $347.67 per hour with respect to its subpoena. Those rates, while high and which include a maximum charge of $450 per hour, do not appear in our experience and knowledge to be out-of-line with rates charged by experienced partners at large Indianapolis firms. As for the Plaintiffs' contention that less-experienced, less-expensive attorneys or paralegals should have spent the bulk of the time on these subpoenas, we disagree. Given the sheer volume of

information sought by the subpoenas in relation to a novel underlying case in which IPPA and LES undoubtedly were interested, if not actually parties to, we see nothing wrong with their having chosen whom they believed to be the best attorneys possible to review the subpoenas.

[34]     In support of their argument that the fees here were excessive, the Plaintiffs cite *Order for Mandate of Funds Montgomery County Council v. Milligan*, 873 N.E.2d 1043 (Ind. 2007). In that case, a law firm for trial judges who successfully sought a mandated increase in their employees' pay submitted an invoice for fees and expenses totaling $128,300. The most highly-paid attorney who worked on the case charged $320 per hour. Our supreme court held that the firm could only collect $72,810.29. It based this reduction on several factors, including a much-lower normal hourly rate for attorneys in Montgomery County than in the Indianapolis area, where the firm was located, the issues in the case were fairly straightforward and did not require excessive legal work, and the fact that the fees sought were substantially more than the total amount of pay increases obtained by counsel, or $85,000. *Milligan*, 873 N.E.2d at 1049-50.

[35]     *Milligan* does not require us to find that the fees here are unreasonable. As for the difference between $320 and $450 per hour, we note that *Milligan* was decided over ten years ago. Also, the hourly rate there was found excessive in part based on the much lower rates in rural Montgomery County. Here, all of the litigation involved parties or entities in Indianapolis or immediately surrounding counties that are part of the metropolitan area. There also is no

recovered judgment with which to compare the approximately $7,500 in attorney fees awarded to IPPA and LES as there was in *Milligan*; regardless, their entitlement to those fees is clearly set forth by our trial rules and caselaw.

[36] We are aware that IPPA and LES are substantively aligned with the Defendants here; a judgment in favor of the Plaintiffs could substantially and negatively impact the pork CAFO industry in Indiana. Thus, IPPA and LES were not necessarily inclined to automatically and fully comply with the Plaintiffs' subpoenas. But they were within their legal rights in not doing so and in hiring counsel of their choice to review the subpoenas to determine if there was any legal basis for resisting them. They also were within their legal rights to seek recovery of attorney fees as nonparties being asked to expend considerable time and effort responding to the subpoenas. The fees awarded to IPPA and LES are not excessive or unreasonable.

[37] On the other hand, we also reject IPPA and LES's cross-appeal contention that they were entitled to the full amount of the fees they sought because they reasonably resisted the subpoenas, as expressly found by the trial court. IPPA and LES argue that once the trial court made such a finding, it was required to award them all attorney fees related to resisting the subpoenas and seeking fees on fees related to resisting.

[38] Trial Rule 34(C)(3) expressly states that, if a trial court *grants* a motion to compel discovery from a nonparty, the order compelling discovery "shall" be conditioned upon the moving party prepaying damages to the nonparty or

obtaining a surety bond or other indemnity against such damages, and that "[s]uch damages *shall* include reasonable attorneys' fees incurred in reasonable resistance . . . ." (Emphasis added). The rule is silent as to what happens if the trial court *denies* a motion to compel, as happened here. In such a case, the express guidance for awarding attorney fees is found solely in Trial Rule 37(A)(4), which provides that the trial court shall order the moving party or the moving party's attorney or both of them to pay attorney fees to the other side, "unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust."[8]

[39] We also note the following observation we made in *IBM*:

> Thus, Trial Rule 34(C)(3) does not by its plain language require that the trial court order payment for all damages a non-party might incur. To hold as much, absent an express statement in the Rule requiring such a conclusion, would be to undermine the trial court's exercise of discretion in discovery matters. Thus, ACS was not as a matter of law entitled to full compensation of all its costs and fees by operation of Trial Rule 34(C) alone.

*IBM*, 999 N.E.2d at 890. We proceeded to hold that the trial court did not abuse its discretion in reducing by one-half ACS's undisputed expenses incurred

---

[8] At first glance, it may seem illogical to guarantee "reasonable resistance" damages to a nonparty if a motion to compel is granted but not if it is denied. We believe the difference can be explained by the fact that the party seeking discovery receives a definitive benefit if a motion to compel is granted, counterbalanced by fees to the nonparty for any "reasonable resistance," whereas there is no benefit to the party if the motion to compel is denied and there is also a strong possibility, but not guarantee, that it also will have to pay attorney fees to the nonparty. In any case, that is the plain language of Rules 34(C)(3) and 37(A)(4).

in reviewing and complying with those requests, out of concerns for "general equity." *Id.* at 891.

[40] The trial court here found that it "would be unjust under these circumstances" to award additional attorney fees to IPPA and LES, also suggesting that the Plaintiffs themselves had substantial justification for filing their motion to compel. Appellant's App. Vol. II p. 27. It also would not be improper to note that the Plaintiffs are individual homeowners represented by a public interest law firm, while IPPA and LES are businesses in close relation to the Defendants who felt comfortable hiring some of the most expensive lawyers in the state to address the subpoenas and who already were awarded approximately $7,500 in attorney fees related to the subpoenas, which resulted in minimal document production to the Plaintiffs. In other words, looking at all the facts and circumstances surrounding the discovery dispute between the Plaintiffs and IPPA and LES, it is apparent the trial court split the baby by awarding IPPA and LES some of the attorney fees it sought, but not all of them. The trial court had broad equitable discretion to fashion such a remedy, which is not in direct conflict with any trial rule. It did not abuse that discretion in refusing to award more attorney fees to IPPA and LES.

## Conclusion

[41] The trial court did not abuse its discretion in denying the Plaintiffs' motion to compel and in awarding $7,553.25 in attorney fees to IPPA and LES. On cross-appeal, the trial court also did not abuse its discretion in refusing to award additional attorney fees to IPPA and LES. We affirm in all respects.

[42]    Affirmed.

May, J., and Bradford, J., concur.